IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

JAMES ROY, on behalf of himself
and all others similarly situated,
4511 Elm St.
Chevy Chase, MD 20815

        Plaintiff,

v.

TITEFLEX CORPORATION t/a GASTITE,
603 Hendee Street
Springfield, MA 01104

and

WARD MANUFACTURING, LLC
117 Gulick Street
Blossburg, PA 16912

        Defendants.

CASE NO.:  384003√

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**RECEIVED**

NOV 08 2013

Clerk of the Circuit Court
Montgomery County, Md.

## CLASS ACTION COMPLAINT

Plaintiff James Roy, by and through undersigned counsel, brings this action on his own behalf and on behalf of two Classes of persons defined below against Defendant Titeflex Corporation ("Titeflex") and Defendant Ward Manufacturing, L.L.C. ("Ward") and for his Complaint alleges, upon information and belief and based on the investigation to date of his counsel, as follows:

### NATURE OF THE ACTION

1.     This is a statewide class action brought by Plaintiff pursuant to Maryland Rule 2-231 on his own behalf and on behalf of two Classes of all similarly situated property owners, against Titeflex and Ward.

2. Titeflex manufactured, distributed, and supplied Gastite® corrugated stainless steel tubing ("CSST") throughout the United States, including Maryland.

3. Ward manufactured, distributed, and supplied Wardflex® CSST throughout the United States, including Maryland.

4. CSST is an ultrathin, flexible piping used to transport natural gas within both residential and commercial structures. It was developed as an alternative to the much thicker, more durable black iron pipe that has been used to transport gas within residential and commercial structures for more than a century.

5. This action alleges that Titeflex and Ward improperly designed and manufactured Gastite® and Wardflex®, respectively, and failed to properly test their resistance to lightning strikes. Gastite® and Wardflex® each have thin walls that are susceptible to perforation by an electrical arc generated by a lightning strike, which can cause and has caused fires, damage to and destruction of residential structures, and creates a substantial and unreasonable risk of death or personal injury.

6. For instance, in Lubbock, Texas in August 2012, one person was killed and another seriously injured when a lightning strike punctured the CSST in a house, instigating a natural gas-fueled fire. Fire and smoke damage affected the entire structure.

7. It is well documented that Gastite® and Wardflex® CSST can fail catastrophically in the presence of lightning. *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage*, The Fire Protection Research Foundation (April 2011), *available at* http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20 Report.pdf. When the gas line becomes energized, the energy from the lightning strike passes

2

through it in search of a path to ground. As it seeks a path to ground, the energy from the lightning strike may jump off the CSST, usually through the air to another nearby conductive material, in what is known as an arcing event. The temperature generated by this lightning-induced event is measured in thousands of degrees, which is easily hot enough to melt and penetrate through the thin skin of the CSST, even though the arcs last only a fraction of a second. When the gas line melts, gas inside is allowed to escape and is ignited by the melting event, causing a gas-fueled fire.

8.     A 2005 expert reported prepared by Mark Goodson, a specialist in electrical and mechanical failure analysis, concluded: "CSST fails when the CSST is contacted by electrical current associated with lightning. Due to its uniform design, all CSST fails in the same manner when insulted by lightning: electricity contacts the CSST, the CSST acts as a conduit for the electrical current, the electricity perforates the pipe and permits gas to escape. During this process, there is ignition of the escaping gas. This problem uniformly affects all CSST brands, in that the products have the same inherent design, thickness (or lack thereof) and physical properties." Mark Goodson and Mark Hergenrether, "*The Causal Link Between Lightning Strikes, CSST, And Fire*," Fire and Arson Investigator (October 2005), available at http://goodsonengineering.com/wp-
content/uploads/2011/08/InvestigatingtheCasualLinkBetweenLightningStrikesCSSTFire.pdf.

9.     After concluding that Gastite® was deficient, Titeflex developed FlashShield® in 2012, which purportedly contains all the features of Gastite®, plus a layer of metal mesh and two layers of semi-conductive polymer to "protect against potential arcing during lightning strikes by mitigating the potential damage to such system caused by electrical arcing."

3

10.     Similarly, after concluding that Wardflex® was deficient, Ward developed Wardflex® II, which purportedly contains all the features of Wardflex®, plus "a new conductive coating that disperses the electrical energy induced on the tubing when an arc occurs between the CSST and another metallic system located in the structure." *See* http://www.wardflex.com/images/Wardflex_II_Sell_web.pdf

11.     The presence of Gastite® and Wardflex® in Plaintiff's and Class A and Class B members' structures creates an unreasonable risk of fire due to lightning strikes.

## THE PARTIES

12.     Plaintiff James Roy is the owner of a house located at 4511 Elm St., Chevy Chase, MD 20815, in which Gastite® and Wardflex® CSST are used to service a gas fireplace, two furnaces, two hot water heaters, and a stove.

13.     Plaintiff, on behalf of himself and all other persons and entities similarly situated, brings this action for and on behalf of the owners of all residential and commercial structures with Gastite®. Gastite® is defective, should never have been sold, and needs to be removed and replaced in all structures.

14.     Plaintiff, on behalf of himself and all other persons and entities similarly situated, brings this action for and on behalf of the owners of all residential and commercial structures with Wardflex®. Wardflex® is defective, should never have been sold, and needs to be removed and replaced in all structures.

15.     Defendant, Titeflex, Inc. is a corporation organized and existing under the laws of Massachusetts having its principal place of business and a headquarters located at 603 Hendee Street in Springfield, Massachusetts 01104.

4

16.     At all times relevant hereto, Titeflex was in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling CSST under the brand name "Gastite®."

17.     Defendant, Ward, Inc. is a corporation organized and existing under the laws of Pennsylvania having its principal place of business and a headquarters located at 117 Gulick Street in Blossburg, PA 16912.

18.     At all times relevant hereto, Ward was in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling CSST under the brand name "Wardflex®."

**JURISDICTION AND VENUE**

19.     Between 2000 and the present, thousands of homes in Maryland, perhaps tens of thousands, were constructed with CSST. Titeflex has approximately 10% share of the CSST market. Ward also has approximately 10% share of the CSST market. It follows that thousands of homes in Maryland were built with Gastite®, Wardflex®, or both.

20.     The average estimated cost of removing and replacing CSST with lead gas pipe in these homes is in excess of $3,000.

21.     This Court has jurisdiction over the subject matter of this action, which is a civil action in which the damages alleged exceed $30,000.

22.     Venue lies in this Court, because Plaintiff resides in Montgomery County, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Montgomery County.

23.     This Court has personal jurisdiction over Defendant Titeflex because its liability in this action arises out of torts and other unlawful actions taken within the State of Maryland,

5

which caused tortious injury within the State of Maryland, because it transacted business, engaged in a persistent course of conduct, and derived substantial revenue in the State of Maryland, and because it contracted to supply Gastite® in the State of Maryland.

24.     This Court has personal jurisdiction over Defendant Ward because its liability in this action arises out of torts and other unlawful actions taken within the State of Maryland, which caused tortious injury within the State of Maryland, because it transacted business, engaged in a persistent course of conduct, and derived substantial revenue in the State of Maryland, and because it contracted to supply Wardflex® in the State of Maryland.

## FACTUAL BACKGROUND OF CSST

25.     CSST was initially developed in Japan during the early 1980's, and marketed as a safe and effective gas distribution system that can withstand damages that can occur during earthquakes and other natural disasters.  CSST has been used in Japan and Europe since 1980, and was introduced in the USA in 1989.

26.     The history of CSST coverage in the USA started in 1983 from a research and development project sponsored by the Gas Research Institute.

27.     The initial standards were developed by the American Gas Association Laboratories and were designated in 1987 as AGA 1-87.

28.     The introduction of CSST into the United States was brought about by the firm Foster-Miller.  According to the National Fire Protection Association, when CSST was first considered in 1988, lightning was given no consideration.

29.     CSST was first recognized by the National Fire Protection Association in the *Fuel Gas Code* NFPA 54 in 1988.  In 1989, the National Fuel Gas Code introduced coverage of CSST.

6

30.     The International Association of Plumbing and Mechanical Officials approved CSST for inclusion in its 2003 Uniform Plumbing Code which opened the doors for CSST to be used in all 50 states.

31.     The CSST system consists of flexible pipe between the building gas source and appliances, as well as fittings and other accessories. The flexibility of the tube allows it to be routed through the building in continuous lengths without the many joints required with rigid piping and without the need for any special tools. The flexible gas piping market in the U.S. is currently concentrated in the residential housing market.

32.     There are approximately ten manufacturers of flexible metal hose in the United States. The U.S. manufacturers include Omega Flex Corporation, Ward Manufacturing, Titeflex, Truflex, Microflex, U.S. Hose, Hose Master, and several smaller privately held companies.

33.     CSST is made from 300 series stainless steel and is more expensive than an equivalent length of iron pipe.

34.     According to industry participants, "CSST has revolutionized the gas-distribution business. It is easy to use and this lowers the cost over the entire installation. Back-breaking black iron pipe projects that demanded eight or 10 laborers can now be handled with ease by only one or two certified CSST installers – freeing up precious labor for other tasks that will keep projects moving forward. Lightweight and flexible Gastite CSST will typically slash installation time by 50% or more." Mary Jo Martin, "*In Less than Two Years, Gastite Establishes Strong Position in Market*," The Wholesaler (March 2009), available at http://www.thewholesaler.com/march_09/gastite_feature.php.

7

35.     The advantages of CSST over traditional black iron pipe also include lower overall installation costs because it can be installed in long uninterrupted lines within the building.

36.     As of March 2013, CSST commands slightly over one-half of the market for fuel gas piping in new and remodeled residential construction in the United States. Rigid iron pipe, and to a lesser degree copper tubing, accounts for the remainder of the market.

37.     To date, over 750 million feet of CSST has been installed in over 5 million homes across the United States. Omega Flex, *CSST vs. Black Iron Pipe*, CSST Facts (2013), available at http://www.csstfacts.org/csst-vs-black-iron-pipe.aspx.

### DANGERS OF LIGHTNING AND CSST

38.     CSST is likely to fail when exposed to electrical insult, particularly lightning. *See* Mark Goodson and Mark Hergenrether, *"Lightning Induced CSST fires"* (August 2011), *available    at*    http://goodsonengineering.com/wp-content/uploads/2011/08/p379-Goodson-TB1140_web.pdf. Gas piping systems are particularly susceptible to damage because they are a potential conductive path for lightning energy, and are likely to be routed near other metal utility lines inside the house.

39.     In an indirect lightning strike, a strike close to a structure or house generates a partial lightning current in the metal links of the building. This electrical energy in attempting to reach ground may arc between metal systems that have different electrical resistance. Arcing can cause damage to the metal systems.

40.     Damage caused by a direct or indirect lightning strike to a CSST system can be described as a small puncture of the tubing wall. This type of damage is caused by an arc of energy "jumping" from a pathway of higher potential to a pathway of lower potential in an effort

8

to find a lower impedance pathway to ground. A puncture in the tubing wall can ignite the natural gas at the hole. This gas can ignite surrounding materials and spread to create an extensive fire, resulting in significant damage to the house, destruction of all of the contents of the house, and potential death or serious personal injury of persons inside the house. This type of damage appears to be consistent around the country.

41.    In standard CSST systems, an electrical bond between the CSST and the building's grounding electrode will not address this issue.

42.    Conventional electrical bonding and grounding of CSST is not sufficient to remediate the risk of a gas-fueled fire resulting from a lightning strike.

43.    Electrical bonding is the process of making an electrical connection between the grounding electrode and any equipment, appliance or metal conductor. Bonding of CSST to a common grounding electrode allows the energy to move at the same rate as the electrical system in unison with the energy wave. The requirement for electrical bonding and grounding is very specific depending on the area's building codes. The provisions for grounding of the electrical system and bonding other metallic systems are contained in the National Electric Code (NEC NFPA 70) and the National Fuel Gas Code (NFGC NFPA 54).

44.    Even if all mechanical and electrical systems of the building are individually electrically bonded, the risk of a CSST induced fire is still present.

45.    For instance, according to an April 2011 study conducted by SEFTIM, issued by the Fire Protection Research Foundation, and sponsored in part by numerous CSST manufacturers, there have been multiple reports of CSST-related fires even when the CSST was electrically bonded. *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage*, The Fire Protection Research Foundation

(April                      2011),                   *available*                   *at*
http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20
Report.pdf.

46.     Thus, even with code-compliant and manufacturer-recommended electrical
bonding, neither Gastite® nor Wardflex® is immune to the risk of damage that can be caused by
lightning.

47.     In fact, these codes are minimum standards that continue to be under review.
Year after year, the standards continue to change, yet prior installations do not benefit from more
stringent changes that are instituted prospectively.

48.     An expert on gas piping opined that "CSST manufacturers give installers and
building inspectors way too much lease in expecting them to do their jobs right. Even when the
job is 'done right,' there is still the opportunity for the CSST to become a conduit for lightning to
ground. Many installers believe that connecting their CSST to an electrical panel with a bond
wire is acceptable, but what most do not realize is that a lot of electrical panels are not properly
grounded to terra firma." In his professional opinion, "If you leave CSST in your building, then
you are gambling or are just plain stupid." John Rocheleau, *"CSST Gas Pipe/Lightning Fires,"*
Protech HVAC (August 1, 2012), available at http://www.protechhvac.com/tag/csst/.

49.     Mark Goodson, an expert in electrical and mechanical failure analysis, has
recommended the following three remediations to prevent CSST induced fires, including
complete removal of CSST from the structure: "(1) convert the structure to electricity only and
remove all gas delivery; (2) retain gas but remove all CSST from the structure and install black
iron pipe; or (3) prevent lightning from contacting the CSST which would prevent perforation
and ensuing fire – i.e., install a NFPA 780 type lightning arrestor system. Without paying for the

costs associated with one of these three solutions, homes or structures containing the CSST are subject to fire due to the uniform failure when electrical current caused by lightning contacts the CSST." Mark Goodson and Mark Hergenrether, *"The Causal Link Between Lightning Strikes, CSST, And Fire,"* Fire and Arson Investigator (October 2005), available at http://goodsonengineering.com/wp-content/uploads/2011/08/InvestigatingtheCasualLinkBetweenLightningStrikesCSSTFire.pdf (emphasis added).

50.    In its own marketing materials, Titeflex admits that "properly bonding and grounding" Gastite® only *"may* reduce the risk of damage and fire from a lightning strike." http://www.gastite.com/downloads/pdfs/gastite_di_guide.pdf (emphasis added).    Although Titeflex claims that bonding and grounding CSST *"should* reduce the risk of arcing and related damage" it does not contend that bonding and grounding eliminate the risk of a lightning-induced CSST-related fire.

51.    Similarly, in its installation guide, Ward concedes that "properly bonding and grounding" Wardflex® only *"may* reduce the risk of damage and fire from a lightning strike." http://www.wardflex.com/images/WARDFLEX_D&I_GUIDE_Eng.pdf    (emphasis    added). Ward claims that bonding and grounding CSST *"should* reduce the risk of arcing and related damage" but it does not state that bonding and grounding eliminate the risk of a lightning-induced CSST-related fire.

52.    The dangers resulting from CSST and lightning strikes have resulted in the Frisco, Texas Fire Department and the Arlington, Texas Fire Department seeking to ban CSST.

53.    As of August 2011, 141 fires involving lightning and CSST had been reported throughout the United States. *See* SEFTIM, *Final Report for Validation of Installation Methods*

11

*for CSST Gas Piping to Mitigate Lightning Related Damage*, The Fire Protection Research Foundation (April 2011), *available at* http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20 Report.pdf.

54.     Although the chance of a fire involving lightning and CSST at a given house or structure is relatively small, the possibility of catastrophic injuries, or even death, to occupants is high. Gas-fueled fires are extremely dangerous and implicate severe life-safety risks.

55.     Thousands of people in the United States are seriously injured, or die, as a result of fires every year. According to a September 2013 report by the National Fire Protection Association (NFPA), firefighters in the United States responded to an estimated 1.375 million fires in 2012. 381,000 of those fires occurred in residential structures and resulted in 2,405 deaths.

56.     Seventeen (17) fires were named catastrophic multiple-death fires, which the NFPA defined as fires or explosions in homes or apartments that result in five or more fire-related deaths, or fires or explosions in all other structures and outside of structures that claim three or more lives. Those 17 fires killed 82 people, 16 of whom were children under age six.

57.     According to the NFPA's September 2013 report, there were 24 catastrophic multiple-death fires in 2011, resulting in the deaths of 117 people, 16 of whom were children under age six.

## BACKGROUND OF TITEFLEX

58.     Titeflex is a global leader in creating and adapting fluid management products and programs. The company has a long history in flexible fluid management products and rigid tube bending capabilities.

12

59.     The Gastite® Division of Titeflex manufactures corrugated stainless steel gas piping for consumers' natural and propane gas needs. The company manufactures flexible metal hose at its facility in Springfield, Massachusetts. The company offers its products through distributors in Orange Park and Miami, Florida; Irvine, California; and Copenhagen, Denmark.

60.     Recognized as a fuel gas piping material since 1988, Titeflex describes Gastite® as a "reliable, cost-effective system that can be installed in all modes of construction."

61.     In 2012, the company developed FlashShield®, which "provides more layers of resistance than any other CSST, while eliminating additional manufacturer-required direct bonding." It consists of a layer of metal mesh between two jackets of semi-conductive polymer. FlashShield® was a specific product developed to reduce the induced lightning hazard.

62.     Upon information and belief, Gastite® was not designed to withstand the massive and unpredictable energy associated with an indirect lightning strike.

63.     Upon information and belief, Titeflex has known since at least 2004 that Gastite® is prone to damage or perforation when subjected to an electrical charge from an indirect or direct lightning strike.

64.     The multi-layered lightning-resistant system added to Titeflex's FlashShield® improves its ability to dissipate arcing energy, reducing the level as it moves downstream which helps to protect regulators, appliance connectors and other mechanical systems, all of which could result in the potential for fire.

65.     Titeflex knew or should have known, prior to Plaintiff's installation of the Gastite® CSST in this case, that the CSST presented an unreasonable risk of failure when subjected to energy from an indirect lightning strike.

13

66.     Despite this knowledge, Titeflex failed to sufficiently warn Plaintiff and Class A or their contractor or subcontractors of the unreasonable risk of failure of the CSST when subjected to energy from an indirect lightning strike.

## BACKGROUND OF WARD

67.     Ward produces a full line of cast and malleable iron pipe fittings.  According to Ward, the "Wardflex®" system offers "professional contractors an extremely flexible, reliable and effective way to distribute fuel gas in a building, eliminating the multiple service points seen at     every     turn     and     connection     with     black     pipe     fittings." http://www.wardflex.com/images/Wardflex_II_Sell_web.pdf.

68.     The company manufactures flexible metal hose at its facility in Blossburg, Pennsylvania.

69.     In 1990, Ward introduced CSST to the North American market.  Since then, according to the company, "the Wardflex® system has become the industry standard in flexible gas piping."  http://www.wardflex.com/images/WardflexBrochureWeb.pdf.

70.     Subsequently, Ward developed Wardflex® II, the next generation of CSST that, according to the company, delivers all the benefits of the original Wardflex® system "with a new conductive coating that disperses the electrical energy induced on the tubing when an arc occurs between     the     CSST     and     another     metallic     system     located     in     the     structure." http://www.wardflex.com/images/Wardflex_II_Sell_web.pdf.  Ward claims that Wardflex® II "has been designed and tested to help mitigate damage caused by transient arcing of lightning induced energy inside a building."  *Id*.  Wardflex® II was a specific product developed to reduce the induced lightning hazard.

14

71.     Upon information and belief, Wardflex® was not designed to withstand the massive and unpredictable energy associated with an indirect lightning strike.

72.     Upon information and belief, Ward has known since at least 2004 that Wardflex® is prone to damage or perforation when subjected to an electrical charge from an indirect or direct lightning strike.

73.     The conductive coating added to Ward's Wardflex® II improves its ability to dissipate arcing energy, reducing the level as it moves downstream which helps to protect regulators, appliance connectors and other mechanical systems, all of which could result in the potential for fire.

74.     Ward knew or should have known, prior to Plaintiff's installation of the Wardflex® CSST in this case, that the CSST presented an unreasonable risk of failure when subjected to energy from an indirect lightning strike.

75.     Despite this knowledge, Ward failed to sufficiently warn Plaintiff and Class B or their contractor or subcontractors of the unreasonable risk of failure of the CSST when subjected to energy from an indirect lightning strike.

### TITEFLEX AND WARD FAILED TO ADEQUATELY TEST GASTITE AND WARDFLEX

76.     An April 2011 study conducted by SEFTIM addresses the CSST failure scenario and suggests the need for significant testing in an effort to "mitigate" lightning related damage. *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage,* The Fire Protection Research Foundation (April 2011), *available                                                                               at* http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20 Report.pdf (the "Report").  The Report was issued by the Fire Protection Research Foundation, a

group that consists of members of NFPA, the National Electrical Contractors Association, the U.S. Army, the New Mexico Institute of Technology, and three private engineering firms, among others. Significantly, the sponsors of the study included numerous CSST manufacturers. The Report recognized the need to conduct numerous tests in an effort to reduce the hazards of the product.

77.    The Report provided numerous examples of CSST failure scenarios.   For instance, the Report noted that CSST can fail due to direct lightning strikes, electrical faults, lightning induced power surges, indirect lightning strikes, and lightning strikes to one of the services supplying the structure.

78.    The Report attempted to offer solutions, which it also calls "mitigations," to address future CSST failure scenarios. The Report cautioned that merely bonding the CSST at its starting and/or ending point may not be sufficient and that "a global equipotential solution is necessary to achieve a complete solution." The "mitigations" would include the following possibilities if supported by testing: multiple bonding, bonding with a short length of conductor, requiring minimum bends, requiring a separation distance from another metallic circuit (such as a chimney flue or cable), and a design change that would enhance the ability to withstand a lightning surge. The Report noted that some manufacturers already included some of these requirements in their prior "installation rules." But the Report cautioned: "However, based on some studied CSST cases, holes do not always occur where the distance between the CSST and a metallic part is the smallest, and thus separation distance may be difficult to address." It also cautioned that none of these potential solutions may actually work: testing was still needed to show whether they will, in fact, work.

16

79.     According to the Report, several tests of CSST had yet to be done.     The

recommended testing is summarized in the Conclusion section, as follows:

> a. "Simulations are needed to show if separation distance is needed based on bonding conductor length and possible lightning currents given from the standard database. Bonding conductors located at the entrance may not be enough if the bonding conductors are too long. In that case, multiple bonding or separation distance may solve the problem (please note that a few cases have shown that incidents occurred in spite of apparent sufficient separation distance)."
>
> b. "Tests should be made to check the ability of CSST to withstand small fault current for a long time, as well as higher fault current for a shorter time. It should be confirmed that multiple bonding is unlikely to create a major problem when surge current is flowing along CSST."
>
> c. "Tests should be performed to identify the impedance (mainly inductance) of CSST per unit measure."
>
> d. "Tests to determine CSST impedance should incorporate the maximum bending radius as given in technical brochures. The effect of bends should be investigated."
>
> e. "Tests should be performed with 8/20 impulses (representing induced surges) to see if this can damage CSST if multiple bonding is not provided."

According to the Report, these needed tests and simulations would allow CSST

manufacturers to adequately determine if multiple bonding is necessary or not.

80.     Based upon information and belief, neither Titeflex nor Ward conducted these

tests on Gastite® or Wardflex®. They did not test and to date have not tested the products

adequately under actual installed conditions. *See* SEFTIM, *Final Report for Validation of*

*Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage,* The Fire

Protection     Research     Foundation     (April     2011),     *available     at*

http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20

Report.pdf (the "Report").

17

81.    According to the Report, testing of CSST under actual installed conditions using transient waveforms can show further limitations that conventional bonding and grounding cannot accommodate.

82.    Accordingly, Titeflex failed to test Gastite®'s ability to withstand such energy when bonded. Adequate testing would have revealed the serious deficiencies in Gastite® in that it would have solidified the knowledge of the link between Gastite® and natural gas fires resulting from lightning strikes.

83.    Further, Ward failed to test Wardflex®'s ability to withstand such energy when bonded. Adequate testing would have revealed the serious deficiencies in Wardflex® in that it would have solidified the knowledge of the link between Wardflex® and natural gas fires resulting from lightning strikes.

**PREVIOUS LITIGATION INVOLVING GASTITE®, WARDFLEX®, AND CSST**

84.    Gastite® and Wardflex® can fail catastrophically as a result of a direct or indirect lightning strike. This phenomenon explains why Gastite® and Wardflex® have been the subject of one nationwide class action; why they have been banned in certain jurisdictions; why Titeflex and Ward offered new and improved versions of the products recently; and why the National Fire Protection Association, the publisher of the *National Fuel Gas Code,* has CSST currently under review. There has been an increase in the frequency of litigation concerning Gastite® and Wardflex® in the last few years.

85.    A class-action lawsuit, *Lovelis, et al. v. Titeflex, et al.,* Case No. Civ-2004-211 (Arkansas Circuit Court, Clark County) filed in Arkansas in 2004 against several manufacturers, including Titeflex and Ward, claimed CSST posed an unreasonable risk of fire from lightning strikes, leading to a 2006 settlement. Both Titeflex, Ward, and the other defendants denied these

18

allegations, and denied any wrongdoing or legal liability, but agreed to settle the matter to avoid further cost and the uncertainty and risk of the outcome of further litigation. Under the Settlement Agreement, Titeflex and Ward agreed to pay the value of each payment voucher redeemed by a class member for the installation of a lightning protection system or bonding and grounding of their CSST products. The settlement class involved "all persons and/or entities who own real property or structures in the United States in which CSST manufactured by the Settling Defendants was installed as of September 5, 2006." It is unknown how many class members received this notice.

86.     The *Lovelis* Settlement Agreement also required Titeflex and Ward to make changes to its marketing materials. Titeflex and Ward agreed to make certain changes to their installation guidelines or technical documents, including (1) adding a reference to the risk posed by lightning to CSST systems; (2) adding a requirement that Gastite® must be installed in accordance with the installation instructions and applicable codes and requirements; (3) adding a requirement that a CSST gas-piping system must be electrically continuous and bonded to a grounding electrode, consistent with NFPA 70; and (4) adding a statement that the owner of the structure should consider whether a lightning protection system is necessary or appropriate, with a reference to NFPA 70.

87.     However, these changes to Titeflex's and Ward's marketing materials do not warn customers that electrical bonding and grounding of Gastite® and Wardflex® do not remove the risk of a fire caused by CSST and lightning.

88.     In October 2010, the largest CSST manufacturer, Omega Flex, took the first case relating to CSST and lightning to trial, *Tincher v. Omega Flex, Inc.*, No. 2008-00974-CA (Pennsylvania, Chester Co. Com. Pleas, Oct. 20, 2010). Terence and Judith Tincher, the

19

plaintiffs, purchased a house that was plumbed with TracPipe® CSST in 1998.   During a thunderstorm in June 2007, a lightning strike energized the line beneath the first floor of the house. The resulting electrical arc created a hole in the piping, igniting natural gas. A large fire erupted, causing a structural collapse in the center of the house. The house and its contents were a total loss. Following an eight day trial, the jury found CSST to be a defective product and imposed strict liability against Omega Flex. Omega Flex argued that a properly bonded CSST system could withstand the energy produced from an indirect lightning strike but Omega Flex's failure to ever test the CSST's ability to withstand such energy, when properly bonded, proved fatal to its defense.  At trial, expert testimony established that the CSST has substantially greater susceptibility to perforation by lightning-induced energy than does black iron pipe, rendering it defective and posing a substantially greater fire hazard. The jury awarded 100% recovery of both the subrogated and uninsured losses, for a total judgment that exceeded $1,000,000.00.

89.    A case in the Middle District of Tennessee, *Konowitz et al. v. Titeflex Corporation*, No. 2:13-cv-00005 (M.D. Tenn. Jan. 22, 2013), is currently in the discovery stages. The plaintiffs in that case have brought claims of negligence and product liability against Gastite after a lightning storm occurred near the Konowitz home and a fire burned the home down.

### REPRESENTATIVE PLAINTIFF JAMES ROY

90.    Plaintiff is the owner of a home located in Chevy Chase, Maryland that has Gastite® manufactured by Titeflex installed in his home.

91.    Plaintiff also has Wardflex® manufactured by Ward installed in his home.

92.    Plaintiff, like other members of Class A, did not change or alter Gastite® since the time it left Titeflex's control.

20

93.     Plaintiff, like other members of Class B, did not change or alter Wardflex® since the time it left Ward's control.

94.     Plaintiff and members of Class A and Class B have suffered damages as a result of Defendants' sale of their defective products and their deceptive practices. While Plaintiff and the Classes may be forced to repair and/or replace Gastite® and/or Wardflex®, they have neither been reimbursed for nor advanced the costs associated with this undertaking.

## CLASS ACTION ALLEGATIONS

95.     Plaintiff brings this class action pursuant to Maryland Rule 2-231 on behalf of himself and Class A, defined as follows:

> All persons or entities in the State of Maryland who own a house, or other structure on which Titeflex's Gastite® was installed after September 5, 2006, or who, after September 5, 2006, purchased a house or other structure in which Titeflex's Gastite® was installed prior to September 5, 2006.

Excluded from Class A are: (a) any judges presiding over this action and members of their families; (b) Titeflex and any entity in which Titeflex has a controlling interest or which has a controlling interest in Titeflex and its legal representatives, assigns and successors of Titeflex; and (c) all persons who properly execute and file a timely request for exclusion from Class A.

96.     Plaintiff also brings this class action pursuant to Maryland Rule 2-231 on behalf of himself and Class B, defined as follows:

> All persons or entities in the State of Maryland who own a house or other structure on which Ward's Wardflex® was installed after September 5, 2006, or who, after September 5, 2006, purchased a house or other structure in which Ward's Wardflex® was installed prior to September 5, 2006.

Excluded from Class B are: (a) any judges presiding over this action and members of their families; (b) Ward and any entity in which Ward has a controlling interest or which has a

21

controlling interest in Ward and its legal representatives, assigns and successors of Ward; and (c) all persons who properly execute and file a timely request for exclusion from Class B.

97.     *Numerosity:* Class A and Class B are each composed of thousands of persons in the State of Maryland, the joinder of whom in one action is impractical. Between 2000 and the present, thousands of homes in Maryland, perhaps tens of thousands, were constructed with CSST.   Titeflex has approximately 10% share of the CSST market.   Ward also has approximately 10% share of the CSST market. It follows that thousands of homes in Maryland were built with Gastite® and/or Wardflex®. Moreover, upon information and belief, the Classes are ascertainable and identifiable from Titeflex and Ward's records or identifying marks on the CSST.

98.     *Commonality:* Questions of law and fact common to Class A exist as to all members of Class A and predominate over any questions affecting only individual members of Class A. These common legal and factual issues include the following:

   a. Whether Gastite® is inherently defective;

   b. Whether Gastite® was in an unreasonably dangerous condition when it was manufactured and distributed;

   c. Whether Gastite® was reasonably safe for its intended use as manufactured and designed;

   d. Whether Titeflex knew or should have known of the defect;

   e. Whether Titeflex concealed from consumers and/or failed to disclose to consumers the defect;

   f. Whether Titeflex failed to provide adequate installation instructions;

   g. Whether Titeflex failed to adequately test for potential defects in Gastite®;

   h. Whether Titeflex failed to adequately warn of the foreseeable risks associated with using Gastite®;

22

    i.   Whether Titeflex omitted critical information regarding defects in its product in its marketing, sales and installation materials;

    j.   Whether Plaintiff and Class A are entitled to compensatory damages, including, among other things: (i) compensation for all out-of-pocket monies expended by members of Class A for replacement of Gastite® and/or installation costs; (ii) the failure of consideration in connection with and/or difference in value arising out of the variance between Gastite® as warranted and Gastite® containing the defect; and (iii) the diminution of resale value of the residences and buildings resulting from the defect in Gastite®;

    k.   Whether Plaintiff and Class A are entitled to all costs associated with replacement of their defective Gastite® with non-defective CSST; and

    l.   Whether Plaintiff and the Class are entitled to restitution and/or disgorgement.

99.    *Commonality:* Questions of law and fact common to Class B exist as to all members of Class B and predominate over any questions affecting only individual members of Class B. These common legal and factual issues include the following:

    a.   Whether Wardflex® is inherently defective;

    b.   Whether Wardflex ® was in an unreasonably dangerous condition when it was manufactured and distributed;

    c.   Whether Wardflex® was reasonably safe for its intended use as manufactured and designed;

    d.   Whether Ward knew or should have known of the defect;

    e.   Whether Ward concealed from consumers and/or failed to disclose to consumers the defect;

    f.   Whether Ward failed to provide adequate installation instructions;

    g.   Whether Ward failed to adequately test for potential defects in Wardflex®;

    h.   Whether Ward failed to adequately warn of the foreseeable risks associated with using Wardflex®;

    i.   Whether Ward omitted critical information regarding defects in its product in its marketing, sales and installation materials;

    j.   Whether Plaintiff and Class B are entitled to compensatory damages, including, among other things: (i) compensation for all out-of-pocket monies

23

expended by members of Class B for replacement of Wardflex® and/or installation costs; (ii) the failure of consideration in connection with and/or difference in value arising out of the variance between Wardflex® as warranted and Wardflex® containing the defect; and (iii) the diminution of resale value of the residences and buildings resulting from the defect in Wardflex®;

k. Whether Plaintiff and Class B are entitled to all costs associated with replacement of their defective Wardflex® with non-defective CSST; and

l. Whether Plaintiff and Class B are entitled to restitution and/or disgorgement.

100.    *Typicality:* Plaintiff's claims are typical of the claims of the members of Class A, as all such claims arise out of Titeflex's conduct in designing, manufacturing, marketing, advertising and selling the defective Gastite® and Titeflex's conduct in concealing the defect in the Gastite® to owners, contractors, developers, and suppliers.

101.    Plaintiff's claims are also typical of the claims of the members of Class B, as all such claims arise out of Ward's conduct in designing, manufacturing, marketing, advertising and selling the defective Wardflex® and Ward's conduct in concealing the defect in the Wardflex® to owners, contractors, developers, and suppliers.

102.    *Adequate Representation:* Plaintiff will fairly and adequately protect the interests of the members of Class A and Class B and has no interests antagonistic to those of either Class. Plaintiff has retained counsel experienced in the prosecution of complex class actions, including consumer class actions involving breach of warranties, product liability and product design defects.

103.    *Predominance and Superiority:* This class action is appropriate for certification because questions of law and fact common to the members of Class A predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of Class A is impracticable.  Should individual Class A members be required to bring

24

separate actions, this Court and courts throughout Maryland would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.

104. Questions of law and fact common to the members of Class B also predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of Class B is impracticable. Should individual Class B members be required to bring separate actions, this Court and courts throughout Maryland would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.

105. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

**COUNT I**
**Strict Liability – Pursuant to § 402A of the Restatement (Second) of Torts**
**(Against Titeflex)**

106. The allegations contained in paragraphs 1-105 are incorporated herein by reference as if fully set forth.

107. At all times relevant hereto, Titeflex was engaged in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling CSST piping, including the Gastite® CSST piping installed at Plaintiff and Class A members' houses.

108. At all times relevant hereto, Gastite® was designed and placed into the stream of commerce by Titeflex.

25

109.    Titeflex designed, formulated, tested, manufactured, inspected, marketed, distributed, supplied and/or sold Gastite® that was defective in design and/or manufacture when the product left the hands of Titeflex. The foreseeable risk from installing Gastite® exceeded any potential benefits associated with the design and/or manufacture of it.

110.    Gastite® manufactured by Titeflex was expected to and did reach Plaintiff and Class A members' houses without substantial change in the condition in which it was designed, manufactured, tested, inspected, distributed, marketed or sold.

111.    Ultimately, Gastite® designed, formulated, tested, manufactured, inspected, distributed, stored, marketed, supplied and/or sold by Titeflex was defective in design and/or manufacture in that, when the product left the hands of the designers, manufacturers, distributors and/or suppliers, it was unreasonably dangerous, more dangerous than a houseowner would expect.

112.    Titeflex knew, or should have known, that at all times mentioned herein, Gastite® was inherently dangerous and unsafe because of its inability to adequately resist lightning strikes.

113.    Plaintiff and Class A, acting as reasonably prudent people, could not discover that Gastite® was defective as mentioned herein, or perceive its danger.

114.    At the time of use of Titeflex's Gastite®, Plaintiff and Class A utilized the piping for the purposes and manner normally intended.

115.    By reason of the foregoing, Titeflex is strictly liable in tort to Plaintiff and Class A for designing, manufacturing, testing, inspecting, distributing, marketing and/or selling Gastite®.

26

116.    Said defects in Gastite® were a substantial factor in causing Plaintiff and Class A damages and injuries and/or placing Plaintiff and Class A members at increased risk of damage and/or harm.

117.    As a direct, proximate, and foreseeable result of the defective condition of Gastite® as manufactured and sold by Titeflex, Plaintiff and Class A have suffered, and will continue to suffer, damages.

## COUNT II
## Strict Liability – Pursuant to § 402A of the Restatement (Second) of Torts (Against Ward)

118.    The allegations contained in paragraphs 1-117 are incorporated herein by reference as if fully set forth.

119.    At all times relevant hereto, Ward was engaged in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling CSST piping, including the Wardflex® CSST piping installed at Plaintiff and Class B members' houses.

120.    At all times relevant hereto, Wardflex® was designed and placed into the stream of commerce by Ward.

121.    Ward designed, formulated, tested, manufactured, inspected, marketed, distributed, supplied and/or sold Wardflex® that was defective in design and/or manufacture when the product left the hands of Ward. The foreseeable risk from installing Wardflex® exceeded any potential benefits associated with the design and/or manufacture of it.

122.    Wardflex® manufactured by Ward was expected to and did reach Plaintiff and Class B members' houses without substantial change in the condition in which it was designed, manufactured, tested, inspected, distributed, marketed or sold.

27

123.    Ultimately, Wardflex® designed, formulated, tested, manufactured, inspected, distributed, stored, marketed, supplied and/or sold by Ward was defective in design and/or manufacture in that, when the product left the hands of the designers, manufacturers, distributors and/or suppliers, it was unreasonably dangerous, more dangerous than a houseowner would expect.

124.    Ward knew, or should have known, that at all times mentioned herein, Wardflex® was inherently dangerous and unsafe because of its inability to adequately resist lightning strikes.

125.    Plaintiff and Class B, acting as reasonably prudent people, could not discover that Wardflex® was defective as mentioned herein, or perceive its danger.

126.    At the time of use of Ward's Wardflex®, Plaintiff and Class B utilized the piping for the purposes and manner normally intended.

127.    By reason of the foregoing, Ward is strictly liable in tort to Plaintiff and Class B for designing, manufacturing, testing, inspecting, distributing, marketing and/or selling Wardflex®.

128.    Said defects in Wardflex® were a substantial factor in causing Plaintiff and Class B damages and injuries and/or placing Plaintiff and Class B members at increased risk of damage and/or harm.

129.    As a direct, proximate, and foreseeable result of the defective condition of Wardflex® as manufactured and sold by Ward, Plaintiff and Class B have suffered, and will continue to suffer, damages.

28

## COUNT III
### Negligence – Design Defect: Failure to Test
### (Against Titeflex)

130.    The allegations contained in Paragraphs 1-129 are incorporated herein by reference as if fully set forth.

131.    Titeflex did not perform adequate testing on Gastite® that was defectively designed, formulated, tested, manufactured, inspected, distributed, marketed, supplied and/or sold to Plaintiff and Class A.

132.    Adequate testing would have revealed the serious deficiencies in Titeflex's Gastite® in that it would have solidified the knowledge of the link between Gastite and natural gas fires resulting from lightning strikes.

133.    Titeflex had and continues to have a duty to exercise reasonable care to properly design, including the duty to test, its Gastite® that it introduced into the stream of commerce, including a duty to ensure that Gastite® does not cause its users, including Plaintiff and Class A, to suffer from unreasonably dangerous consequences of using it.

134.    Titeflex breached these duties by failing to exercise ordinary care in the design, specifically the testing of Gastite®, which it introduced into the stream of commerce, because Titeflex knew or should have known that Gastite® created an unreasonable risk of fire and danger, and failed to do the appropriate testing.

135.    Titeflex knew or should have known that consumers such as Plaintiff would foreseeably suffer economic damages or injury, and/or be at an increased risk of suffering damage and injury, as a result of its failure to exercise ordinary care in the design of the product by failing to do the appropriate testing.

136.    By reason of the foregoing, Plaintiff and Class A experienced and/or are at risk of experiencing death and/or serious personal injury, as well as financial damage and injury.

137.    As a direct and proximate result of Titeflex's failure to test Gastite® designed, formulated, manufactured, inspected, distributed, marketed, warranted, advertised, supplied and/or sold by Titeflex, Plaintiff and Class A have suffered damages.

## COUNT IV
### Negligence – Design Defect: Failure to Test
### (Against Ward)

138.    The allegations contained in Paragraphs 1-137 are incorporated herein by reference as if fully set forth.

139.    Ward did not perform adequate testing on Wardflex® that was defectively designed, formulated, tested, manufactured, inspected, distributed, marketed, supplied and/or sold to Plaintiff and Class B.

140.    Adequate testing would have revealed the serious deficiencies in Ward's Wardflex® in that it would have solidified the knowledge of the link between Wardflex® and natural gas fires resulting from lightning strikes.

141.    Ward had and continues to have a duty to exercise reasonable care to properly design, including the duty to test, its Wardflex® that it introduced into the stream of commerce, including a duty to ensure that Wardflex® does not cause its users, including Plaintiff and Class B, to suffer from unreasonably dangerous consequences of using it.

142.    Ward breached these duties by failing to exercise ordinary care in the design, specifically the testing of Wardflex®, which it introduced into the stream of commerce, because Ward knew or should have known that Wardflex® created an unreasonable risk of fire and danger, and failed to do the appropriate testing.

30

143.    Ward knew or should have known that consumers such as Plaintiff would foreseeably suffer economic damages or injury, and/or be at an increased risk of suffering damage and injury, as a result of its failure to exercise ordinary care in the design of the product by failing to do the appropriate testing.

144.    By reason of the foregoing, Plaintiff and Class B experienced and/or are at risk of experiencing death and serious personal injury, as well as financial damage and injury.

145.    As a direct and proximate result of Ward's failure to test Wardflex® designed, formulated, manufactured, inspected, distributed, marketed, warranted, advertised, supplied and/or sold by Ward, Plaintiff and Class B have suffered damages.

## COUNT V
## Negligence – Failure to Warn
## (Against Titeflex)

146.    The allegations contained in Paragraphs 1-145 are incorporated herein by reference as if fully set forth.

147.    At all times mentioned herein, Titeflex designed, formulated, tested, manufactured, inspected, distributed, marketed, supplied and/or sold Gastite® to Plaintiff and Class A.

148.    At all times material hereto, the use of Gastite® in a manner that was intended and/or reasonably foreseeable by Titeflex involved substantial danger that would not be readily recognized by an ordinary user of Gastite®.

149.    At all times material hereto, this danger was known or knowable by Titeflex, in light of the generally recognized and prevailing knowledge available at the time of manufacture and design, as described herein.

31

150.    Titeflex, as the manufacturer of Gastite®, had a duty to warn Plaintiff and Class A of all dangers associated with the intended use.

151.    Titeflex was negligent and breached its duty of care by negligently failing to give adequate warnings to purchasers and users of Gastite®, including Plaintiff, about the unreasonably dangerous and defective condition of Gastite®, the likelihood of CSST-induced fires, and the substantial and unreasonable risk of death or personal injury Gastite® creates.

152.    Titeflex failed to exercise reasonable care in their design, marketing, and sales so as to inform Plaintiff and Class A of the dangers inherent associated with using Gastite® in their structures. Titeflex failed to adequately warn Plaintiff of any dangers.

153.    Titeflex knew, or by the exercise of reasonable care, should have known of the inherent design defects and resulting dangers associated with using Gastite®, and knew that Plaintiff and/or Class A could not reasonably ascertain these dangers. Notwithstanding, Titeflex failed to exercise reasonable care in providing consumers with adequate warnings.

154.    Despite the fact that Titeflex knew or should have known that Gastite® was associated with and/or could cause natural-gas fed fires and creates a substantial and unreasonable risk of death or serious personal injury, Titeflex continued to market, manufacture, distribute and/or sell Gastite® to consumers, including Plaintiff and Class A.

155.    As a direct and proximate result of Titeflex's failure to adequately warn consumers of the dangerous properties of using Gastite® in their structures, Plaintiff and Class A have suffered damages as set out herein.

## COUNT VI
### Negligence – Failure to Warn

32

## (Against Ward)

156.    The allegations contained in Paragraphs 1-155 are incorporated herein by reference as if fully set forth.

157.    At all times mentioned herein, Ward designed, formulated, tested, manufactured, inspected, distributed, marketed, supplied and/or sold Wardflex® to Plaintiff and Class B.

158.    At all times material hereto, the use of Wardflex® in a manner that was intended and/or reasonably foreseeable by Ward involved substantial danger that would not be readily recognized by an ordinary user of Wardflex®.

159.    At all times material hereto, this danger was known or knowable by Ward, in light of the generally recognized and prevailing knowledge available at the time of manufacture and design, as described herein.

160.    Ward, as the manufacturer of Wardflex®, had a duty to warn Plaintiff and Class B of all dangers associated with the intended use.

161.    Ward was negligent and breached its duty of care by negligently failing to give adequate warnings to purchasers and users of Wardflex®, including Plaintiff, about the unreasonably dangerous and defective condition of Wardflex®, the likelihood of CSST-induced fires, and the substantial and unreasonable risk of death or personal injury Wardflex® creates.

162.    Ward failed to exercise reasonable care in their design, marketing, and sales so as to inform Plaintiff and Class B of the inherent dangers associated with using Wardflex® in their structures. Ward failed to adequately warn Plaintiff of any dangers.

163.    Ward knew, or by the exercise of reasonable care, should have known of the inherent design defects and resulting dangers associated with using Wardflex®, and knew that

33

Plaintiff and/or Class B could not reasonably ascertain these dangers.  Notwithstanding, Ward failed to exercise reasonable care in providing consumers with adequate warnings.

164.    Despite the fact that Ward knew or should have known that Wardflex® was associated with and/or could cause natural-gas fed fires and creates a substantial and unreasonable risk of death or serious personal injury, Ward continued to market, manufacture, distribute and/or sell Wardflex® to consumers, including Plaintiff and Class B.

165.    As a direct and proximate result of Ward's failure to adequately warn consumers of the dangerous properties of using Wardflex® in their structures, Plaintiff and Class B have suffered damages as set out herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, and on behalf of all others similarly situated, prays for a judgment against Titeflex and Ward as follows:

1.    For an order certifying Class A and Class B, pursuant to Maryland Rule 2-231, appointing Plaintiff as representative of Class A and Class B, and appointing the law firms representing Plaintiff as counsel for Class A and Class B;

2.    For compensatory damages sustained by Plaintiff and Class A;

3.    For compensatory damages sustained by Plaintiff and Class B;

3.    An award of costs as allowed by law;

4.    For both pre-judgment and post-judgment interest on any amounts awarded;

5.    For payment of reasonable attorneys' fees and expert fees as may be allowable under applicable law; and

6.    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

This the 8th day of November, 2013.

TYCKO & ZAVAREEI LLP

Jonathan K. Tycko
Andrea R. Gold
TYCKO & ZAVAREEI LLP
2000 L Street NW
Suite 808
Washington, DC 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

Steven M. Pavsner
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland  20770
Telephone: (301) 220-2200

Jonathan Shub
SEEGER WEISS LLP
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Telephone: (215) 564-2300
Facsimile (215) 851-8029

## RULE 1-313 CERTIFICATION

Undersigned hereby certifies that he is admitted to practice law in the State of Maryland.

Jonathan K. Tycko

Andrea R. Gold

35